Fariborz AKBARI and Kambiz Makaremi, Plaintiffs,

v.

Robert GODSHALL, Jr., District Director, Colorado District of the Immigration and Naturalization Service, Benjamin Civiletti, Attorney General of the United States, and Immigration and Naturalization Service of the United States, Defendants.

Civ. A. No. 81-K-39.

United States District Court, D. Colorado.

Oct. 20, 1981.

Kenneth H. Stern, Karp, Goldstein & Stern, Doris E. Burd, Denver, Colo., for plaintiffs.

James W. Winchester, Asst. U. S. Atty., Denver, Colo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

KANE, District Judge.

In this action plaintiffs seek declaratory, injunctive and mandamus relief barring enforcement of deportation orders that have been entered against them. Plaintiffs filed their complaint and then moved for a preliminary injunction. After I held a hearing on this motion on February 25, 1981, the parties stipulated that plaintiffs' departure would be stayed pending resolution of this case. I held trial on August 24–25, 1981. The parties then submitted written closing arguments. I now issue findings of fact and conclusions of law.

## I. SUBJECT–MATTER JURISDICTION

8 U.S.C. § 1329 vests jurisdiction in the district courts in "all causes, civil and criminal, arising under any of the provisions of [8 U.S.C. §§ 1151–1363]." On the other hand, 8 U.S.C. § 1105a(a) states that review in the courts of appeal shall be the "sole and exclusive procedure for the judicial review of all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under [8 U.S.C. § 1252(b)]," subject to some exceptions that are not relevant here.

■ It is not always easy to determine what is included in a "final order of deportation." Compare *Cheng Fan Kwok v. INS*, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), with *Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963).[1] Plaintiffs here challenge the INS decision not to extend plaintiffs' stays and not to reinstate them to nonimmigrant student status. They also challenge the INS decision not to grant them extensions in their voluntary departure status. All of these decisions occurred over nine months after the deportation decisions. These decisions were also made by officials other than the special inquiry officers. I conclude that all of those decisions were sufficiently unrelated to the deportation decisions as not to be included in the final orders of deportation. See *Cheng Fan Kwok v. INS*, 392 U.S. at 212–13, 88 S.Ct. at 1974. I therefore hold that this court has jurisdiction to hear all of plaintiffs' claims.

## II. FINDINGS OF FACT

### A. Plaintiff Akbari

Fariborz Akbari, an Iranian national, entered the United States on August 31, 1978 with an F–1 student visa to attend high school. That visa expired on June 20, 1979 when he graduated from high school. Akbari filed a form I–538, requesting an extension of stay and transfer to another school in early October, 1979. He could not file this form until he was accepted as a student at the new school. He was not accepted by Colorado Technical College until October 1, 1979. Plaintiff also asserts that he could not file the form I–538 until his passport was renewed, which was not until August, 1979. Defendants argue that the "INS might have been able to work something out" if Akbari had applied for an extension of his visa before it expired. That point is disputed by plaintiffs. The parties agree, however, that Akbari violated the terms of his visa by staying in the United States after it expired.

In December, 1979, pursuant to presidential order, the Immigration and Naturalization Service (INS) ordered all Iranian student aliens to report to the INS. See 8 C.F.R. § 214.5 (1981). Akbari complied with this order on December 10, 1979. Because of Akbari's late filing of his form I–538, the INS issued an order to show cause, pursuant to 8 C.F.R. § 242.1 (1981), on December 11, 1979. At a hearing held on March 11, 1980 pursuant to *id.* § 242.16 the special inquiry officer found that Akbari was deportable, and granted him until June 15, 1980 to deport voluntarily, as then allowed by 8 C.F.R. § 244.1.[2]

On June 12, 1980 Akbari, along with others not parties to this suit, filed an action in this court, Civil Action No. 80–K–741, alleging that defendants had abused their discretion. On June 20, 1980 Akbari voluntarily dismissed this action; on that same day the INS granted Akbari an extension of his voluntary departure until December 31, 1980. Akbari claims that the INS agreed to grant him further extensions so that he could stay in the United States until he received his bachelor's degree. Defendant Godshall denies, this, stating that the INS made no firm guarantee of further extensions, but only stated that such extensions

---

1. For a discussion of the Congressional purpose of vesting exclusive jurisdiction to review deportation orders in the courts of appeals, see H.R.Rep.No.1086, 87th Cong., 1st Sess., [1961] *U.S.Code Cong. & Ad.News* 2950, 2966–77.

2. 8 C.F.R. § 244.1 (1981) was amended on April 25, 1980 to limit the voluntary departure time that special inquiry officers could grant to 15 days. 45 Fed.Reg. 27917 (1980).

were possible provided that there was not an intervening change in policy. I find that there was no explicit agreement that the INS would grant further extensions.

In December, 1980 Akbari sought a further extension in his voluntary departure status for another six months. After the INS denied this he applied for reinstatement to nonimmigrant-student status. The INS denied this request on January 9, 1981, and extended Akbari's voluntary departure date until January 23, 1981. Akbari then filed this action. Since then he has remained a full-time student in good standing.

### B. Plaintiff Makaremi

Kambiz Makaremi entered the United States on February 3, 1979 with an F-1 student visa to attend an English language school. He completed that course of study in August, 1979, and then began studying at Arapahoe Community College in September, 1979. His visa expired on October 8, 1979. Makaremi filed a form I-538, requesting an extension of stay and transfer to another school on November 13, 1979.

On December 10, 1979 Makaremi complied with the order requiring him to report to the INS. Because of his late filing of his form I-538, the INS issued an order to show cause, pursuant to 8 C.F.R. § 242.1 (1981), on December 11, 1979. At a hearing held on February 22, 1980 pursuant to id. § 242.16 the special inquiry officer found that Makaremi was deportable, and granted him until June 15, 1980 to depart voluntarily, as then allowed by 8 C.F.R. § 244.1.[3]

On June 20, 1980 Makaremi advised the INS that he had transferred to the University of Northern Colorado, and requested an extension of his voluntary departure. The INS extended his voluntary departure until December 31, 1980. As with plaintiff Akbari, plaintiff Makaremi claims that the INS agreed to grant him further extensions

until he received his bachelor's degree. Defendants dispute this, just as they do in plaintiff Akbari's case. I find that there was no explicit agreement that the INS would grant further extensions.

On December 29, 1980 Makaremi requested a further extension of his voluntary departure status for another six months. After the INS denied this request, he applied for reinstatement to nonimmigrant-student status. The INS denied this request on January 9, 1981 and extended Makaremi's voluntary departure date until January 23, 1981. Makaremi then filed this action. He has remained a full-time student in good standing since then.

### C. INS Policy Toward Iranian Students

Before November 12, 1979 the INS did not give any special treatment to Iranians. On that date defendant Godshall received directions from the regional INS commissioner to order special interviews for Iranian students. See 8 C.F.R. § 214.5 (1981).[4] Soon thereafter the INS changed markedly its policy toward Iranian students. One foreign-student advisor testified:

Up until December 6 of 1979, those students who had minor violations, such as late applications, overstays, and so on, were reinstated in status and were sent away with a clean bill of health. After December 6, those persons who had even the most minor violations, including late applications for extension of stay or late applications for transfer, were issued orders to show cause and were brought to an Immigration hearing.

[Question:] Were you able to discern any general trend emanating from the local office toward Iranians regarding enforcement of minor or technical violations, or what was done as a result of that?

[Answer:] I'm not sure what emanated but certainly the local offices of the Im-

---

**3.** See note 2 *supra.*

**4.** This order resulted from President Carter's November 10, 1979 order to the INS, which was a result of the taking of American hostages

at the American Embassy in Iran on November 4, 1979. See [1979] Presidential Documents at 2107 (Week ending Nov. 16, 1979). (Govt. Ex.A.)

migration Service enforced the regulations most strictly with regard to Iranian students from that time on, from that December 6 time on.

Any Iran student who was found guilty of any minor or technical violation, in addition any substantive violation, was issued an order to show cause, was taken to a hearing, and in general was found to be—I can't say for all these cases, but the cases I'm familiar with, was found to be deportable, even on the grounds of very minor kinds of infractions.

[Question:] What was occurring during this period of time—and I'm referring subsequent to December 6, 1979—to students of other nationalities?

[Answer:] They continued to be treated normally, although the Immigration Service did indicate to all of us that it intended to enforce the regulations somewhat more strictly against all students, but our experience was still that these minor technical violations were overlooked.

I have no instances of a person, other than an Iranian, who were subjected to any kind of a prosecution or any kind of disciplinary action by the Immigration Service because of a minor violation of that kind.

On January 4, 1980 defendant Godshall received an order from the acting INS commissioner to treat all Iranian students who reported as required by 8 C.F.R. § 214.5 "in the same manner as students of all other nationalities." (Govt. Ex. 3A.)

After the break of diplomatic relations between the United States and Iran on April 7, 1980, the INS amended its policy to become more hostile toward Iranian aliens. See, e. g., 8 C.F.R. §§ 214.1(c), 244.1 (1981). These amendments did not apply to plaintiffs, however. On June 10, 1980 defendant Godshall received a telegram from the INS commissioner stating that,

Iranian students whose authorized period of stay has expired or will expire on specific dates can be granted extensions to complete their current course of study or degree level (e. g., bachelor's master's,

Ph.D., etc.), at which point they should be required to leave....

All officers are cautioned to be strict in identifying students eligible for these extensions. Doubts about eligibility for an extension should be resolved against the grant of the extension. [8 C.F.R. § 214.-1(c)] will be amended accordingly.

(Iranian Project # 75, Pls. Ex. 8.)

Based on this telegram, defendant Godshall concluded that plaintiffs' voluntary departure dates should be extended from June to December, 1980, even though the telegram referred only to extensions of stays and not to extensions of voluntary departures.

On July 7, 1980 the INS commissioner issued another telegram, Iranian Project # 78 (Pls. Ex. 9), which authorized defendant Godshall to reconsider granting extensions of stay to certain Iranian students. On August 13, 1980 this telegram was amended to read:

District Directors may reconsider and grant retroactive extensions of stay to those post-secondary Iranian students who are overstays or were placed under proceedings solely as a result of their authorized stay expiring and being made ineligible for extension by reason of the amendment to 8 CFR § 214.1(c) published April 16, 1980. To promote uniformity within the region, the following guidelines are furnished. The term overstay is interpreted to mean only those Iranian students who had filed timely applications for extensions of stay but because of the working of the regulation under 8 CFR § 214.1(c) were denied an extension after April 16, 1980 even though they were in all other respects eligible for an extension. Those Iranians under proceedings who failed to file timely applications for extension should not be considered unless pursuant to 8 CFR § 214.-1(c) failure to file a timely application is found to be excusable and he or she is otherwise eligible to receive an extension of stay.

(Pls. Ex. 10.) On August 25, 1980 the INS commissioner issued Iranian Project # 80 (Pls. Ex. 11), which emphasized that exten-

sions of stay were only to be issued to allow aliens to complete a course of study, but not to start a new one.

On October 14, 1980 defendant Godshall received Iranian Project # 89 (Govt. Ex. B–1), which stated:

Reports from the field indicate little progress in effecting the actual departure from the United States of deportable Iranian students has been made. This is despite the fact that the Iranian student project is presently the first priority for the INS. More than 7600 deportable Iranian students have been located by INS to date in this project, but departure has been verified on only 414. More than 4,000 Iranian cases have been referred to by deportation branches to investigations because the Iranians have failed to appear for a hearing or have absconded and failed to depart and must be located a second time.

Therefore commencing immediately any deportable Iranian student located shall not be released from INS custody unless an appropriate delivery or departure bond has been posted with INS.... at the time of the immigration judges final order granting voluntary departure, the bond shall again be reviewed and increased if appropriate to insure the alien's departure or appearance. If no bond was previously posted, an appropriate departure bond shall be required as a District Director's condition to voluntary departure. If no bond has been previously posted or none is posted following a grant of voluntary departure by an immigration judge, the alien shall be detained. All criminal investigators, notwithstanding the decision unit to which assigned, shall be considered as available to bring this project to a prompt conclusion. As stated above this project is the number one priority for INS.

Based on this telegram, defendant Godshall stated:

That entire telegram was interpreted as the controls on Iranians at this point who were in violation of stay were very stringent, very tight.

He did not, however, order the revocation of voluntary departure status for Iranian students who had been given it in June, 1980, but decided to wait and review these cases when the period for voluntary departure was near to ending. He then ordered some Iranian students' voluntary departure dates to be extended if he felt that there were extenuating circumstances. He did not extend the departure dates of the two plaintiffs, however. At trial Godshall stated that this decision was based on the nature of plaintiffs' violations of their visas, and not because of their Iranian nationality. Godshall stated that their nationality may have caused the INS to scrutinize their cases more carefully, but it did not affect the standards that the INS actually applied. Although plaintiffs offered extensive testimony on the treatment of non-Iranians with respect to extensions of stays and reinstatement of visas, they did not offer any testimony regarding extensions of voluntary departure.

In spite of Godshall's statement that the INS denial of plaintiffs' requests for extensions of stay were based on the same criteria that were used for all aliens, I find that the INS denied the extensions of stay because plaintiffs were Iranians. Aliens of other nationalities were routinely granted extensions under similar circumstances. I find that the INS denial of plaintiffs' requests for reinstatement were not because of their nationality. Several other Iranians were reinstated, leading me to the conclusion that plaintiffs' reinstatement requests were denied because of factors other than their nationalities. Finally, there is insufficient evidence for me to determine that the INS denial of plaintiffs' requests for extensions of voluntary departure were based on their nationality.

## III. CONCLUSIONS OF LAW

### A. Equal Protection

In 1943, the Supreme Court declared that,

[d]istinctions between citizens solely because of their ancestry are by their very

nature odious to a free people whose institutions are founded upon the doctrine of equality.

*Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). One year later the court declared:

all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny.

*Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944). Although a person's nationality is not completely immutable, most of the same factors are present when a person is discriminated against because of his nationality as when a person is discriminated against because of his race or national origin. It is therefore appropriate to apply the same constitutional analysis in both types of cases.[5]

■ Because the Fourteenth Amendment applies only to state action, its Equal Protection Clause does not apply to actions of federal officials. The U.S. Supreme Court has held, however, that the Due Process Clause of the Fifth Amendment also prohibits many forms of racial discrimination. *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). When

a federal rule is applicable to only a limited territory, such as the District of Columbia, or an insular possession, and when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause.

*Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976) (footnote omitted). The two clauses may not afford coextensive protections, however, when there are

overriding national interests which justify selective federal legislation that would be unacceptable for an individual State. *Id.*

■ The Supreme Court has often declared that immigration laws are subject only to limited review by the courts. *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Mathews v. Diaz*, 426 U.S. 67, 77–80, 96 S.Ct. 1883, 1890–91, 48 L.Ed.2d 478 (1976). Immigration laws will therefore be upheld if supported by some rational basis. *Alvarez v. District Director, INS*, 539 F.2d 1220, 1224 (9th Cir. 1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1334, 51 L.Ed.2d 596 (1977). Immigration regulations are likewise entitled to great deference;

When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. If the agency which promulgates the rule has direct responsibility for fostering or protecting that interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption.

*Hampton v. Mow Sun Wong*, 426 U.S. at 103, 96 S.Ct. at 1905. Several courts accordingly have held that regulations promulgated by the INS commissioner that explicitly discriminate against Iranian aliens will be upheld if supported by a rational basis. *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981); *Narenji v.*

---

5. Defendants argue that they should be granted the same broad discretion in deciding whom to deport that a prosecutor has in deciding whom to prosecute, citing *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). In that case the court held,

the conscious exercise of some selectivity in enforcement is not in itself a federal constitu-

tional violation, so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.

*Id.* at 364, 98 S.Ct. at 668 (citation omitted). Because the major issue in this case is whether the INS's selectivity was based upon "an unjustifiable standard," the citation is inapposite.

*Civiletti,* 617 F.2d 745, 747 (D.C.Cir.1979), *cert. denied sub nom., Confederation of Iranian Students v. Civiletti,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). Directives of the INS commissioner also have been upheld when they were within the scope of a presidential directive. *Yassini v. Crosland,* 618 F.2d 1356 (9th Cir. 1980).

Plaintiffs have not offered any evidence to demonstrate that any of the directives of the INS commissioner or acting commissioner were not within the scope of a presidential directive. They also do not assert that any of the classification against Iranians are not supported by at least a rational basis. I therefore conclude that defendants' actions should be upheld if they were carrying out INS directives. To the extent the INS district director's actions discriminated against Iranians, and were not carrying out directives of the INS commissioner they are subject to strict scrutiny and should be flatly rejected.

### 1. Extension of Stay

 In my findings of fact, I found that the INS denied the extensions of stay because plaintiffs were Iranians. I also conclude, however, that the defendants were properly carrying out orders of the INS commissioner in denying the extensions. Iranian Project # 78, as amended, ordered:

> Those Iranians under proceedings who failed to file timely applications for extension should not be considered unless pursuant to [8 C.F.R. § 214.1(c)] failure to file a timely application is found to be excusable and he or she is otherwise eligible to receive an extension or stay.

8 C.F.R. § 214.1(c) (1981) excuses failures to file timely extensions of stay for Iranians only under four specified circumstances. Only the fourth one is relevant here. It provides:

> in the case of a "J" or "F" nonimmigrant student, an extension of stay is sought in order to complete a current course of study, or to begin high school, college, or graduate studies if he had already been accepted by the appropriate institution on or before June 9, 1980.

Because both plaintiffs' visas have expired, neither one was a "J" or "F" nonimmigrant student when he applied for an extension of stay. The defendants therefore properly followed the INS commissioners directive in denying plaintiffs' requested extensions of stay. At trial the parties disputed whether Iranian Project # 78 applied to the plaintiffs. I conclude that, even if it did not, the INS commissioner's orders demonstrate an intent to not allow Iranians to begin a new course of study. Plaintiffs each had begun a new, unauthorized course of study. In refusing to approve this change defendants were properly following their directions.

### 2. Reinstatement

 Because I found that defendants did not discriminate against plaintiffs because of their nationality in denying their requests, plaintiffs fail to state a claim for reinstatement under their equal protection argument.

### 3. Extension of Voluntary Departure

 There was insufficient evidence for me to form a conclusion on whether the INS denied plaintiffs' requests for extensions of their voluntary departure because of their nationality. Plaintiffs therefore have failed to meet their burden of proving a claim for extensions of voluntary departure under their equal protection argument.

### B. Abuse of Discretion

In addition to arguing that defendants' actions denied plaintiffs equal protection of the laws, they also argue that defendants abused their discretion in denying plaintiffs' various requests. I consider each type of request separately.

### 1. Extension of Stay

 Plaintiffs argue that the INS denial of their requests for extensions of stay was an abuse of discretion because their visa violations were only "minor" and "technical." I reject this argument. While it is true that the INS often overlooks the fact that applicants are a few months late in

filing for extension of stay, it is not clear that this was the basis for the decision here. Plaintiffs have not demonstrated that they would have been entitled to extensions of stay even if they had filed on time. Plaintiffs have therefore not demonstrated that defendants abused their discretion in denying extensions of stay.

### 2. Reinstatement

■ Plaintiffs argue that the INS should have applied the general criteria for reinstatement, as now codified in 8 C.F.R. § 214.2(f)(8), 45 Fed.Reg. 7268 (1981). That regulation now provides:

> Any alien who was admitted to the United States as, or whose status has been changed to, an F–1 nonimmigrant student, and who has overstayed the authorized period of stay granted by the Service or who has otherwise violated the conditions of such status may be reinstated in the discretion of the district director to lawful nonimmigrant student status only if the student:
>
> (1) is currently pursuing a full course of study at an approved school,
>
> (2) has not been employed without authorization, and
>
> (3) is not deportable on any ground other than section 241(a)(2) or (8) of the Act, or § 214.1(g) of this Chapter.
>
> Additionally, the student must establish to the satisfaction of the district director that his/her violation of status resulted from circumstances beyond his/her control or that failure to receive reinstatement to lawful status would result in considerable hardship to the student.

I conclude that even under these standards, plaintiffs would not have been eligible for reinstatement. First, they had already been found deportable.[6] Second, plaintiffs have not established that their violations of status were a result of circumstances beyond their control. Plaintiffs therefore have not demonstrated that the defendants abused their discretion in denying reinstatement.

### 3. Extension of Voluntary Departure

■ Plaintiffs also argue that defendant Godshall abused his discretion in not granting them additional extensions in their voluntary-departure status. Plaintiffs point out that 8 C.F.R. § 244.1 was amended to limit the length of voluntary departure that a special inquiry officer could grant to a deportable Iranian alien, but that 8 C.F.R. § 244.2 was not similarly amended to limit the amount of voluntary-departure time that an INS district director could grant. Plaintiffs then argue:

> the District Director abused his discretion by incorrectly interpreting the law and by failing to exercise his discretion.

I conclude that this argument is without merit. Just because defendant Godshall could have extended plaintiffs' voluntary-departure periods does not mean that he was required to. Plaintiffs have not demonstrated that he abused his discretion in not doing so.

### C. Administrative Procedure Act

■ Plaintiffs next assert that the INS violated the Administrative Procedure Act, 5 U.S.C. § 553, by not publishing the Iranian Project Telegrams. This argument is without merit. 5 U.S.C. § 553(a)(1) states that the notice and hearing requirements do not apply "to the extent that there is involved—a . . . foreign affairs function of the United States." Because these telegrams were clearly issued to carry out President Carter's Iranian policy, they involve a foreign affairs function.

### D. Estoppel

Plaintiffs' final argument is that defendants should be estopped from denying plaintiffs further six-month extensions of their voluntary departure because they understood that they would be granted further

---

6. As I noted in section I *supra*, the finding that plaintiffs were deportable is not subject to review here. The grounds for the deportability finding are also not one of those listed in the regulation.

six-month extensions.[7] I found that the INS did not agree to further six-month extensions, but only stated that they were possible.

▮ In order for estoppel to be invoked against the federal government plaintiffs must demonstrate, in addition to all of the other elements of estoppel, that the government engaged in affirmative misconduct. *Santiago v. INS*, 526 F.2d 488, 491–92 (9th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1975), (citing *Hibi v. INS*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973)). In this case plaintiffs have not demonstrated that any government officials have engaged in affirmative misconduct. Plaintiffs' estoppel claim must therefore fail.

### E. Conclusion

▮ Although the INS singled out plaintiffs for special treatment that was not given to non-Iranian student aliens, the special treatment was all in furtherance of President Carter's foreign policy[8] and was pursuant to orders from the INS acting commissioner. There was therefore no violation of the equal protection component of the Due Process Clause. To the extent that plaintiffs were not singled out for special treatment, defendants did not abuse their discretion.

### IV. ORDER

IT IS ORDERED that judgment shall enter in favor of the defendants and against the plaintiffs on all claims for relief. Each party to bear his or its own costs.

---

**7.** Plaintiff Akbari claims that he gave up his earlier lawsuit challenging his deportation order in reliance of this INS representation.

**8.** The wisdom of such a policy is clearly a matter for the executive branch of the government to determine. It is only because of a difficult adherence to the doctrine of judicial restraint that I am able to reach my conclusion in this case. In short, while I believe that a foreign policy which discriminates against students on the basis of nationality is odious, I recognize that it is not subject to judicial review.