HOSPITAL SAN RAFAEL, INC., et al., Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary, Department of Health and Human Services, Defendant.

Civ. No. 87–1393 HL.

United States District Court, D. Puerto Rico.

Dec. 26, 1991.

Nelson Biaggi, Ramirez, Latimer & Biaggi, San Juan, P.R., Michael W. Ford, Miami, Fla. pro hac vice, for plaintiffs.

Wanda Rubianes Collazo, Asst. U.S. Atty., for defendant.

LAFFITTE, District Judge.

## OPINION AND ORDER

This case involves a challenge to the implementation of the prospective payment system of Medicare reimbursement for inpatient hospital services in Puerto Rico. Plaintiffs, Hospital San Rafael, Inc., M. Pavía Fernández, Inc., and Hospital Damas, Inc., three private hospitals incorporated in Puerto Rico allege that the method employed by the Secretary of Health and Human Services ("Secretary") to determine reimbursement amounts for Puerto Rico hospitals is arbitrary and capricious, unconstitutional and contrary to the statutory provision establishing the Puerto Rico prospective payment system, 42 U.S.C. § 1395ww(d)(9) *et seq.* ("Puerto Rico PPS statute"). Before the Court is the Secretary's motion for summary judgment. For the following reasons, the Secretary's motion is hereby granted.

## I. BACKGROUND

The Medicare program reimburses health care providers that furnish inpatient care to qualified Medicare beneficiaries. *See* Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq.*[1] Congress has given broad authority to the Secretary to regulate Medicare reimbursements and to establish methods to determine the extent of reimbursable costs. 42 U.S.C. § 1395h(a). Prior to 1983, Medicare payments were largely cost-based; providers were entitled to reimbursement of actual costs. 42 U.S.C. §§ 1395f(b),

---

**1.** In addition to payment for inpatient hospital services and other primary institutional care, which is covered by Part A of the Medicare Act, Medicare also pays for physician services under Part B. Part A is funded by Social Security taxes. Part B is a voluntary insurance program funded, in part, by premium payments from beneficiaries. This case involves Medicare payments for hospital services under Part A only.

1395x(v)(1)(A). To curb hospital cost increases, Congress replaced the cost-based system of reimbursement in 1983 with a prospective payment system ("PPS" or "the system") to be phased in for most national hospitals over a four year period. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, 42 U.S.C. § 1395ww(d)(1)(A) and (B); 42 C.F.R. §§ 412.20 and 412.23(f).

Unlike the cost-based system, PPS provides payment to hospitals on a uniform standard, grounded in the economic experience of hospitals as a whole. Under PPS, hospitals are reimbursed prospectively for operating costs of inpatient services based on a predetermined, nationally applicable rate for all patient discharges. A separate payment rate is developed to correspond to 468 diagnostic related groups ("DRGs"). This fixed amount is based on an estimate of the cost to efficiently provide treatment for a particular ailment. Payment is then made to hospitals on the basis of each discharged patient depending upon that patient's applicable DRG.[2] 42 U.S.C. § 1395ww(d)(1)(A). Accordingly, efficient health care providers may keep PPS reimbursements that exceed their actual costs, while inefficient providers must look beyond Medicare to subsidize hospital costs that exceed the fixed PPS reimbursement. *See* S.Rep. No. 98–23, 98th Cong. 1st Sess. 47 (1983).

In 1986, Congress initiated the PPS reimbursement plan in Puerto Rico, *see* Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 9304 (Oct. 21, 1986) ("OBRA") and the Secretary implemented this legislation on September 1, 1987. 42 C.F.R. §§ 412.200–412.220. OBRA outlines a seven step process for determining the PPS rates for Puerto Rico. *See* 42 C.F.R. §§ 412.200–412.220.

*(1) Determination of Target Amounts*

The Secretary first determines the "target amount" for each participating Puerto Rico hospital. 42 U.S.C. § 1395ww(b)(3)(A). The target amount represents the actual costs borne by each hospital in a base year.[3] The use of these target amounts as the basis for determining the PPS rates is meant to insure that payment under PPS will closely approximate the actual economic experiences of Puerto Rico hospitals.

*(2) Updating the Target Amounts*

The target amounts are then updated for inflation to mid-fiscal year 1988 levels by prorating the applicable percentage increase for fiscal year 1988. *See* 42 U.S.C. § 1395ww(b)(3)(B).

*(3) Standardizing the Target Amounts*

After arriving at updated target amounts, Congress has directed the Secretary to remove distorting effects stemming from several sources, including variations in area wage levels. 42 U.S.C. §§ 1395ww(d)(2)(C)(ii), 1395ww(d)(9)(B)(ii); *See generally* 52 Fed.Reg. 33,034, 33,066 (Sept. 1, 1987). To effect this standardization for the cost variation at issue in this action—differences in area wage levels— the Secretary first divides the target amounts into labor and nonlabor components derived from the national hospital market basket.[4] This division is necessary since wages correspond only to the labor-

---

**2.** The Court notes that there are exceptions to the PPS payment plan based strictly on DRGs. *See* 42 C.F.R. §§ 412.70(a)(3) and 412.80–412.84.

**3.** The Secretary determined the target amount for each hospital for the period beginning in the fiscal year 1987. 42 U.S.C. § 1395ww(d)(9)(B)(i). The target amount consists of the maximum allowable operating expenses recognized under Medicare Part A for each hospital's 1987 fiscal year, the year prior to the implementation of PPS in Puerto Rico.

**4.** The hospital market basket is a hospital price index based on prices of various categories of goods and services purchased by hospitals. The data is based on a national survey including Puerto Rico. The primary function of the market basket is to track fluctuations in the price of goods and services purchased by hospitals in order to furnish inpatient care. The Secretary has employed the market basket to determine what portion of the nation's hospital's operating costs is labor-related, including wages, salaries, employee benefits, and what portion is not labor-related, such as malpractice insurance and utility costs.

related costs of a hospital. The labor component is 74.39 percent of each hospital's updated target amount. 52 Fed.Reg. at 33,044. In order to remove the effect of disparate wages, this labor component is divided by a wage index for the geographic area in which each hospital is located. This yields a standardized target amount taking into account variations in area wage levels.

The wage index emerges as a critical link in the creation of the PPS rates. Its construction is also central to the instant action. The wage index eliminates the distorting effects of differences in area wage levels by measuring the value of each area's wages against a single standard, the national average hospital wage. The calculation of the wage index is itself achieved through a seven step process. *See* 52 Fed. Reg. at 33,040–41.

First, each non-Federal hospital in the United States and Puerto Rico subject to PPS is classified into either an urban or rural area. Hospitals in urban areas are further subdivided into Metropolitan Statistical Areas ("MSAs"). There are six urban areas and one rural area in Puerto Rico. The Secretary then adjusts the total gross salary figure reported for each hospital in order to eliminate distortion in data caused by differing fiscal year ends. Next, the Secretary excludes from the computation of the indices any hospitals with aberrant hourly wages.[5]

The total hospital salaries are then added within urban and rural areas to yield the total gross hospital salary per area. The total salary per area is then divided by the total number of paid hours per area to yield an average hourly wage for each area. This procedure is then repeated on a national level; that is, the adjusted total gross salary figure for all hospitals in the United States and Puerto Rico is divided by the total number of paid hours in the United States and Puerto Rico to yield a national average hourly wage. Finally, the average hourly wage for each area is divided by the average hourly wage for the country.

This determines the wage index for each area.

#### (4) *Determination of the Discharge-Weighted Average*

Following the standardizing of the target amounts, the Secretary determines the average standardized amount per discharge in urban and rural settings for Puerto Rico. 42 U.S.C. § 1395ww(d)(9)(B)(iii). These amounts are arrived at by first determining the total labor-related and nonlabor-related standardized costs for urban and rural areas of Puerto Rico. This is reached by adding the target amounts for each hospital in each area. The four total costs are divided by the total number of discharges in urban and rural areas, respectively. This process yields four standardized average amounts per discharge: two for labor and nonlabor costs in Puerto Rico's urban areas; and two for labor and nonlabor costs in Puerto Rico's rural areas. *See* 52 Fed.Reg. at 33,062, 33,070, Table 1c.

#### (5) *Adjustment for Outlier Payments*

The Secretary is often required to reimburse hospitals for extremely high costs or extended lengths of stay. These reimbursements, termed "outlier" payments, fall outside the scope of the regular rate of reimbursement. Accordingly, Congress has required the Secretary to adjust the average standardized amounts to account for these payments by estimating the degree to which outlier payments will be made in each urban and rural area. The average standardized amounts are then reduced proportionally.

#### (6) *Adjustment for Differences in Area Wage Levels*

The Secretary reemploys the wage index to adjust the average urban and rural standardized amounts, arrived at in steps one through five, to account for variations in area wage levels. 42 U.S.C. § 1395ww(d)(9)(B)(vi). This is done by multiplying the labor-related portion of the average standardized amounts by the "appro-

---

**5.** Hospitals that paid less than $3.35 per hour (the federal minimum wage) or greater than

$23.61 per hour (two and a half times the national average hourly wage) were excluded.

priate wage index for the area in which the hospital is located." 52 Fed.Reg. at 33,065. The use of the wage index here differs from the use of the wage index to adjust for variations in area wages discussed in the context of step three. There, the use of the wage index was an adjustment to the updated target amounts for each hospital. These updated target amounts then form the basis for the discharge-weighted average standardized amounts for urban and rural areas. Here, the discharge-weighted average standardized amounts are multiplied by the appropriate wage index. The purpose of this adjustment is to permit "hospitals in high wage areas [to] receive somewhat larger payments than hospitals in low wage areas." H.R.Rep. No. 98–25, 98th Cong., 2nd Sess. 132 (1983), U.S.Code Cong. & Admin.News 1983, pp. 143, 351.

(7) *Determination of Payment Rates Per DRG*

The final step in determining PPS rates for Puerto Rico hospitals involves the addition of the average adjusted standardized labor-related amount for urban areas, arrived at in step six, to the nonlabor-related average standardized amount for urban areas. The average standardized amounts for rural areas are similarly added. The total adjusted average standardized urban amount per discharge is then multiplied by the predetermined weighting factor corresponding to a particular DRG. This product determines the payment rate for that ailment rendered at a hospital in either an urban or rural area. Since Congress has specified that the overall PPS payment rate for Puerto Rico providers is to consist of a blend of seventy-five percent of a Puerto Rico adjusted rate and twenty-five percent of the national rate, 42 U.S.C. § 1395ww(d)(9)(A); 42 C.F.R. section 412.-204,[6] seventy-five percent of this figure is added to twenty-five percent of the national rate for the same DRG to reach the overall amount to be paid to the Puerto Rico hospital.[7]

## II. THE PRESENT ACTION

Embodied in plaintiffs' amended complaint, filed September 21, 1988, are four separate attacks on the Puerto Rico PPS statute. Two claims stem from the Secretary's use of the wage index. First, plaintiffs argue that the application of the wage index is arbitrary and capricious because it is based in part on wage data from Puerto Rico hospitals not subject to the federal minimum wage laws. Second, plaintiffs assert that the Secretary's reliance on the national hospital market basket in the calculation of the wage index is contrary to law because Puerto Rico data is not exclusively utilized.

Plaintiffs further contend that the regulations implementing the Puerto Rico PPS statute are arbitrary and capricious because the Secretary failed to combine the wage indices for Caguas and San Juan, Puerto Rico into one urban area. Finally, plaintiffs allege that the Puerto Rico PPS

---

6. The national rate is derived from a process similar to that employed to determine the Puerto Rico adjusted rate. The primary difference is that the national rate is based on national data and the Puerto Rico rate is based predominantly on Puerto Rico data. The national rate is arrived at by reaching a discharge-weighted average of the national urban and rural adjusted standardized amounts. These amounts are further adjusted for different area wage levels, accomplished by multiplying the national amount by the applicable Puerto Rico wage index. The national labor-related standardized amount is then added to the national nonlabor-related standardized amount. The resulting sum is finally multiplied by the applicable DRG weighting factor.

7. For example, in order to ascertain the PPS rate for a hospital in San Juan for a particular DRG, the following steps are taken. First, the Puerto Rico labor/urban average standardized amount—arrived at in steps one through five— is multiplied by the wage index that corresponds to the San Juan MSA. This adjusted labor/urban average standardized amount is then added to the Puerto Rico nonlabor/urban average standardized amount. This sum is then multiplied by the predetermined weight of a particular DRG. The product of this computation equals the Puerto Rico adjusted PPS rate for the treatment of the particular DRG at this hospital. Seventy-five per cent of this figure is added to twenty-five per cent of the national rate for this DRG to reach the overall payment amount.

statute violates the Equal Protection clause of the United States Constitution because it results in a lower level of payment to Puerto Rico hospitals, which are owned, operated, and staffed predominantly by Hispanic persons.[8] Plaintiffs request declaratory and injunctive relief.

Plaintiffs moved for a preliminary injunction prohibiting further enforcement of the Puerto Rico PPS statute and its implementing regulations. The Secretary responded with a motion to dismiss the action for failure to exhaust administrative remedies. On May 23, 1988, after hearing oral argument, the Court denied plaintiffs' motion for a preliminary injunction. The Court denied that it had subject matter jurisdiction over plaintiffs' claims. On August 9, 1989 the Secretary filed the instant motion for summary judgment, and plaintiffs opposed on October 31, 1989.

### III. DISCUSSION

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party must "adumbrate 'an absence of evidence to support the nonmoving party's case,'" *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)), and the opposing party may not merely rest on general denials and point to the initial pleadings for support; rather it must counter the motion with respect to specific genuine issues of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is warranted, the Court views the facts alleged in the light most favorable to the nonmoving party. *Rossy*

*v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir.1989).

■ Judicial review of plaintiffs' challenge to the substantive validity of the regulations implementing PPS in Puerto Rico is limited to the standards set forth by the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* ("APA"). Under the APA, a reviewing court may set aside an administrative decision only if that decision is beyond the agency's statutory authority or is "arbitrary, capricious, an abuse of discretion or not otherwise in accordance with the law." 5 U.S.C. § 706(2)(A), (C); *Natural Resources Defense Council v. United States Environmental Protection Agency*, 824 F.2d 1258, 1267 (1st Cir.1987). Under this standard, the scope of review is narrow. The court's task is to determine only whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Manuf. Ass'n. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

■ Where, however, an agency has relied on factors beyond those enumerated by Congress, or where explanations for agency actions run counter to the evidence presented, an agency's rule normally will be considered arbitrary and capricious. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. The agency has the burden of articulating "a satisfactory explanation for its actions including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). In this regard, the agency's rational need not contain ideal clarity; rather agency action may be upheld so long as the court can discern a reasoned basis for its decision.

---

**8.** Plaintiffs also alleged that the regulations implementing PPS in Puerto Rico were promulgated illegally in that the Secretary failed to provide plaintiffs with data upon which he had relied in constructing the wage index. This, plaintiffs argued, deprived them of the right to comment meaningfully on the proposed regulations. The Secretary has since provided plaintiffs with the requested data and plaintiffs have

been able to comment on the wage index in light of that data. It is uncontested that this alleged procedural defect in the promulgation of the regulations has been cured. Accordingly, because a case or controversy no longer exists on this issue, this aspect of plaintiffs' case is moot. *See O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

*Id.* (citing *Bowman Transportation, Inc., v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)).

■ Often, complex statutes allow for a myriad of methodologies, and the attractiveness of the elected means of implementing the congressional mandate will undoubtedly fluctuate with the differing perspectives of the beneficiaries. Thus, under the arbitrary and capricious standard a court "need not find that [the agency's action] is the only permissible construction that [it] might have adopted but only that [the agency's] understanding ... is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]." *Chemical Mfrs. Assn. v. National Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *see also State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 (a reviewing court may not "substitute its judgment for that of the agency"). A court's deference to an agency's decision is greatest when reviewing technical matters, including scientific data and statistical methodology—matters that are normally left to the sound discretion of the administrator. *National Ass'n. of Metal Finishers v. Environmental Protection Agency,* 719 F.2d 624, 657 (3rd Cir.1983), *rev'd on other grounds,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985).

With this standard in mind, the Court proceeds with a discussion of plaintiffs' four claims. Plaintiffs have left two claims unopposed, choosing instead to rest on the initial pleadings. The Court will consider each claim in turn, beginning with the two contested issues.

## A. *The Wage Index*

As discussed above, Congress mandated that updated target amounts be standardized and adjusted for area wage differentials. 42 U.S.C. §§ 1395ww(d)(2)(C)(ii), 1395ww(d)(9)(B)(ii). Nevertheless, the statute is silent as to the method of implementation. Left to his discretion, the Secretary has utilized a wage index which includes surveys from all non-federal hospitals subject to PPS in the wage index data base. This data base thus includes private hospitals, subject to the minimum wage requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"),[9] as well as state-operated hospitals and Commonwealth of Puerto Rico hospitals ("Commonwealth hospitals") not subject to FLSA.

■ Plaintiffs contend that the wage index employed by the Secretary in calculating PPS payment rates is arbitrary and capricious because the wage data upon which it is based includes Commonwealth hospitals not subject to the minimum wage. Plaintiffs argue that since the wage index is ultimately an average of hospital area wages, the inclusion of Commonwealth hospitals with uniformly lower hourly wages has the effect of distorting the true area wage level being paid by private hospitals in Puerto Rico. Plaintiffs suggest that this ultimately translates into unduly low PPS payment rates.

The linchpin of plaintiffs' argument is their belief that the treatment of Commonwealth hospitals should be analogous to federal hospitals. The similarity stems from the fact that Commonwealth hospitals adhered to a lower uniform pay rate throughout the island just as federal hospitals adhere to a separate national pay scale. Since the Secretary eliminated federal government hospitals from wage index

---

**9.** The exemption from the minimum wage requirement had its genesis in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which held unconstitutional Congress' attempt to extend minimum wage requirements to all governmental employees. The Supreme Court, in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), overruled *National League,* and held that federal minimum wage requirements were applicable to employees of governmental entities. Consequently, Congress amended the FLSA to require adherence to minimum wage requirements for governmental entities on or after April 1, 1986. Pub.L. 99–150, Nov. 15, 1985. However, during the entire period that the Health Care Financing Administration conducted its survey of salary and hours data from the Puerto Rico hospitals—the survey that provided the data for the wage index—the Commonwealth hospitals were not subject to the minimum wage requirements of the FLSA.

calculations to avoid unfairly distorted wage indices, plaintiffs argue that there is no reason not to exclude Commonwealth hospitals. The Secretary offered the following explanation for the exclusion of federal hospitals from the wage index data base:

> It is our belief that the exclusion of Federal hospital data improves the accuracy of the wage index so that the index correctly reflects actual differences in wages from one area to another area.... [T]he exclusion of Federal government hospital data improves the accuracy of the wage index because most Federal hospitals characteristically employ physicians and other high salaried professionals whose salaries are based on national rather than local wage scales. This factor tends to overstate the average hospital wage in areas with Federal institutions as compared to areas without such Federal facilities.

49 Fed.Reg. 46,495 (Nov. 26, 1984). Plaintiffs argue that the appropriateness of eliminating distortions on the high side by excluding federal hospitals from the wage index should be mirrored by the elimination of distortions on the low side by excluding data from Commonwealth hospitals. The Secretary's failure to do so, plaintiffs claim, is arbitrary and capricious. The Court, however, is not so persuaded.

As the Secretary points out, the overarching principle of the construction of the PPS rates is the inclusion of data from all institutions that are subject to the system and the exclusion of data from those hospitals that are not. The Secretary asserts, and the Court agrees, that there is no inconsistency in excluding federal hospitals from the wage index while including data from Commonwealth hospitals since federal hospitals generally do not participate in the Medicare program. 42 U.S.C. §§ 1395f(c), 1395qq. By contrast, Commonwealth hospitals are subject to PPS. When compiling data to be utilized in assessing payment rates, it is entirely appropriate to include, to the extent possible, those institutions that will ultimately benefit from the Medicare program while excluding those hospitals that will not receive any reimbursement.

A second reason provided by the Secretary for including all PPS subscribers irrespective of whether the hospital paid minimum wage, turns on the importance of a consistent determination of average area wages nationwide. The Secretary argues that this consistency would be destroyed by removing Commonwealth hospitals since state-operated hospitals would not be similarly exempt. PPS is based on standard rates that reflect the average costs of all hospitals in the nation that are subject to the system. As the Secretary argues, removal of the Commonwealth hospitals would undermine the accuracy of the wage indices which would in turn damage the integrity of PPS as a whole.

The Secretary further notes that exempting Commonwealth hospitals from the wage index would open the door for other hospitals to single out health care providers that pay lower wages and unfairly prejudice surrounding hospitals by distorting the wage index in certain areas. To a degree, this prejudice appears to be unavoidable. Nevertheless, to offset the ill effects of this occurrence, the Secretary has eliminated all hospitals—including Commonwealth hospitals—that paid an average hourly wage below the minimum wage from the computation of the wage indices. *See* 52 Fed.Reg. at 33,040–41.

Plaintiffs recognize that because Commonwealth hospitals participate in Medicare, these hospitals are not entirely on the same footing as federal hospitals. Yet, plaintiffs contend that it is inequitable to treat Commonwealth hospitals and state-operated hospitals alike. Plaintiffs suggest that Puerto Rico is unique in that Commonwealth hospitals paid lower wages on a uniform basis throughout the island, whereas state-operated hospitals did not uniformly pay below the minimum wage.

In lieu of empirical evidence, plaintiffs have submitted wage indices from geographic areas nationwide which show higher wages being paid in the United States as

compared to Puerto Rico.[10] Plaintiffs draw the inference from these wage indices that state-operated hospitals paid higher wages than their Commonwealth counterparts. In a syllogistic leap, plaintiffs conclude that because state-operated hospitals are not paying uniformly lower rates as compared to private hospitals in the United States, there is a rational basis for eliminating Commonwealth hospitals while retaining state-operated hospitals.

This argument is unavailing. The Court's task is not to determine the reasonableness of plaintiffs' approach to the methodology of calculating the PPS rates. Rather, our limited task is to focus on the Secretary's explanation for his actions in order to discern a logical relationship between the means used and the purpose to be achieved. Here, there is no indication that the Secretary has acted contrary to the law by including the wage data from Commonwealth hospitals. Moreover, the Court finds that the Secretary has provided compelling reasons for utilizing the data from Commonwealth hospitals in the construction of the wage index. It is not within the province of this Court to determine which of two approaches better serves a certain constituency. Thus, whatever the merit of certain alternative methods, the Court finds that the methodology employed by the Secretary, and specifically the inclusion of Commonwealth hospitals in the Secretary's wage index data base, is not arbitrary and capricious.[11]

## B. *The National Hospital Market Basket*

■ Plaintiffs also claim that the use of the national hospital market basket as a means of ultimately standardizing hospital target amounts is contrary to law and is arbitrary and capricious.[12] Specifically, plaintiffs argue that the Secretary's reliance on the national market basket for the determination of the labor and nonlabor-related costs contravenes the requirement that the Secretary determine "a Puerto Rico adjusted DRG prospective payment rate." 42 U.S.C. § 1395ww(d)(9)(B). Plaintiffs contend that this language clearly mandates the use of separate labor and nonlabor rates specific to Puerto Rico, rather than simply applying national percentages obtained from the market basket. Plaintiffs find support for their interpretation in the legislative history of the Puerto Rico PPS statute, which states that "the Secretary would be required to include Puerto Rico in the prospective payment system. The rates would be established at a 75% Puerto Rico specific rate ..." H.R.Rep. No. 99–571 at 416, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3813. The use of the national market basket, however, is entirely consistent with the Puerto Rico PPS statute.

As the Secretary notes, the market basket figures corresponding to the labor and nonlabor-related costs represent data obtained from hospitals on the mainland as well as from hospitals in Puerto Rico. Thus, data from Puerto Rico directly con-

**10.** *See* P.Ex.C. References throughout to plaintiffs' exhibits are referred as ("P.Ex."); references to defendant's exhibits are referred to as (D.Ex."). All plaintiffs exhibits correspond to "Plaintiffs' Response To Defendant's Motion For Summary Judgment And Memorandum Of Law"; the Secretary's exhibits correspond to "Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment."

**11.** The Court also notes that Congress has amended the PPS statute yearly since 1984, yet Congress has not directed the Secretary to alter the practice of including data from hospitals not subject to the minimum wage. This ratification, while not dispositive, is an indication that Congress is satisfied that the Secretary's actions are

rationally related to the Congressional objective of reforming the cost-based system and replacing it with PPS. *See F.D.I.C. v. Philadelphia Gear Corp.,* 476 U.S. 426, 437, 106 S.Ct. 1931, 1937–38, 90 L.Ed.2d 428 (1986) ("when the statute ... has been reenacted without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'") (quoting *NLRB v. Bell Aerospace,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)).

**12.** Step three of OBRA's seven step process to determine Puerto Rico's PPS rates involves the standardization of the hospitals' target amounts. These target amounts correspond to the operating expenses for a hospital's fiscal year.

tributes to the national market basket data base. The Puerto Rico PPS statute does not require the use of Puerto Rico specific data exclusively, nor does it require the use of Puerto Rico specific data at every step of the process. Rather than utilizing figures derived exclusively from Puerto Rico data, the Secretary has incorporated both Puerto Rico and national data in the construction of a Puerto Rico adjusted PPS rate. The Court does not find, and plaintiffs have failed to prove, that the Puerto Rico PPS statute requires the exclusive use of Puerto Rico specific data. Accordingly, the use of the national hospital market basket in the calculation of the labor and nonlabor components in the construction of the wage index is not contrary to law.

Alternatively, plaintiffs argue that even if the Secretary has discretion to utilize national data, the use of the national hospital market basket in step three of the methodology to establish standardized payments for Puerto Rico is arbitrary and capricious. Plaintiffs contend that there is no rational basis for the Secretary to assume that national labor and nonlabor costs appropriately correspond to costs for hospitals in Puerto Rico. Rather, plaintiffs suggest that Puerto Rico experiences higher non-labor costs than hospitals nationally, due to local excise taxes associated with the importation of medical supplies and equipment.

Plaintiffs point to a Health Care Financing Administration ("HCFA") report, authored by the regional administrator for the region including Puerto Rico, which discusses the shortcomings of the application of national standards to Puerto Rico. *See* P.Ex.D. The report concludes that "there are unique factors in Puerto Rico that render HCFA's cost and performance expectations, as nationally formulated, effectively inoperable in Puerto Rico." *Id.* at 1. The report further recommends that

"HCFA adopt a set of alternative performance standards governing budgetary and savings goals for the Medicare contractors in Puerto Rico." *Id.* at 2.[13]

The Court finds, however, that the Secretary has articulated a satisfactory explanation for the use of the national market basket. While the Secretary admits that labor costs in Puerto Rico may be lower than on the mainland, he points out that the HCFA's Division of National Cost Estimates computed the labor-related portion of costs for Puerto Rico hospitals using Puerto Rico market basket data exclusively. The report indicated that Puerto Rico's labor costs represented 71.99 percent of its total costs, or approximately two and a half percent less than the national labor-related portion of the market basket. *See* D.Ex.C. However, even assuming that the labor component in Puerto Rico was as low as fifty percent, rather than the 74.39 percent derived from the national market basket, the Secretary estimates that payments to Puerto Rico hospitals would increase by $60,000 or .05 percent. Thus, if the figure of 71.99 percent is utilized, it is evident that any increase in payment would be negligible. In light of these circumstances, the Court finds that any interference with the Secretary's methodology is unwarranted.

### C. *The Assignment of Separate Wage Indices*

The standardization of the target amounts for each hospital for differences in area wage levels is accomplished by assigning wage indices to urban and rural areas and then dividing the target amount for a particular hospital by the wage index corresponding to the area in which that hospital is located. After dividing Puerto Rico into six urban areas and one rural area, the Secretary assigned a wage index

---

**13.** Many reasons for higher medical costs in Puerto Rico are detailed in the report, including "lack of telephones," "ant intrusions into the computers," " 'long' Christmas holiday period" and "bombing of subpower stations." P. Ex. D at 6. Plaintiffs cite to the report generally, but specifically focus on higher excise taxes as the most influential factor. In this vein, the report says that "Puerto Rico is located over 1000 air miles from the nearest United States mainland and transportation costs of imports are very expensive. This economic factor adds substantially to the cost of every imported item. Cost of products are higher in Puerto Rico because shipping costs are imposed on almost everything since very little is locally produced." P. Ex. D at 9.

of .4001 to the urban city of Caguas.[14] In their amended complaint, plaintiffs argue that this wage index is arbitrary and capricious.

Plaintiffs initially point out that the wage index for Puerto Rico's rural areas is .5536. Plaintiffs allude to the fact, without expressly so articulating, that this is incongruous since it indicates that higher wages are being paid in the rural areas than in the urban area of Caguas. For support, plaintiffs rest on the conclusory assertion that hospitals in Caguas paid higher wages than in the rural areas.

■ In his motion for summary judgment, the Secretary's unopposed argument points out that rather than arbitrarily assigning a wage index to Caguas, the Secretary exercised great care in establishing the wage indices in Puerto Rico. Indeed, after receiving comments concerning the wage indices, *see* 52 Fed.Reg. 22,080 (June 10, 1987), the Secretary reexamined the classification of certain hospitals, and subsequently placed several hospitals in urban areas that had previously been assigned to the rural area. This necessitated an adjustment of the wage index for Caguas which was recalculated and increased to its present rate. *Compare* 52 Fed.Reg. at 22,-135 *with* 52 Fed.Reg. at 33,095. The record is devoid of any indication that the Secretary failed to consider relevant factors in his calculations. Standing alone, the fact that a rural area pays higher wages than a particular urban area does not amount to cogent evidence of arbitrary or capricious action.

■ Plaintiffs, however, also claim that the wage index for Caguas lacks a rational basis and is contrary to applicable law because the Secretary has failed to combine Caguas with the neighboring city of San Juan to yield one wage index. Here, plaintiffs rely on the Office of Management and Budget's ("OMB") determination that the areas of San Juan and Caguas should be consolidated into one MSA.[15] Plaintiffs assert that, in maintaining a separate wage index for Caguas, the Secretary has acted contrary to the OMB's directives. This argument confuses the classification system of the OMB and misstates the Secretary's obligation with respect to the implementation of that system.

The OMB designates MSAs in the event that federal agencies need to utilize geographical statistical data. OMB initially groups urban areas separately, either as MSAs or as Primary Metropolitan Statistical Areas ("PMSAs").[16] OMB then connects some of these areas to form Consolidated Metropolitan Statistical Areas ("CMSAs"). The CMSA grouping is a broader classification used by OMB as an alternative way of combining large urban areas for statistical purposes. *See* 45 Fed. Reg. 956 (Jan. 3, 1980).

In order to adjust a hospital's target amount for variations in area wage levels, and to compute separate urban and rural area wage averages, Congress has provided the Secretary with limited authority to define these geographic regions. *See* 42 U.S.C. § 1395ww(d)(9)(B)(iii). The Secretary is required to "compute a discharged weighted average of the standardized amounts ... for all hospitals located in an urban area and for all hospitals located in a rural area.... Urban area means an area within a standard Metropolitan Statistical Area (as defined by the Office of Manage-

---

**14.** This figure corresponds to the average hourly wages of hospitals in the Caguas area. Understood in terms of a national average hourly wage, the figure means that the average hourly wage of hospitals in Caguas is 40.01% of the national average hourly wage. The remaining wage indices for Puerto Rico are as follows: Ponce—.5513, San Juan—.5387, Mayaguez—.4842, Aguadilla—.4624, Arecibo—.4401, and all rural areas—.5536. These wage indices are based upon data collected in an HCFA survey of all non-federal hospitals in Puerto Rico in 1984. *See* 52 Fed.Reg. at 33,095–100, Tables 4a and 4b.

**15.** An MSA is simply a densely populated area and can also include neighboring communities that have a high degree of economic and social integration with that area. 45 Fed.Reg. 956 (Jan. 3, 1980).

**16.** PMSAs are generally larger than MSAs and are usually more closely connected to neighboring urban areas. 45 Fed.Reg. at 956–60.

ment and Budget) or within such similar area as the Secretary has recognized under subsection (a) of this section by regulation." 42 U.S.C. § 1395ww(d)(2)(D). Indeed, as both parties concede, the Secretary has adopted the MSA classification system created by OMB. 42 C.F.R. section 412.208(f)(i).[17]

Nevertheless, while the Secretary admits that OMB has consolidated Caguas with San Juan to create one statistical area, this synthesis pertains only to OMB's classification of urban areas nationwide into CMSAs. The use of the MSA classification, however, does not require an agency to utilize the CMSA classification as well. In fact, as the Secretary points out, the use of the MSA classification in the construction of the PPS rates precludes the use of the CMSA classification. Were it otherwise, all hospitals nationwide that are currently grouped into urban areas would have to be reclassified into CMSAs thereby necessitating the calculation of new wage indices nationally. Plaintiffs have failed to allege any reason at all that would warrant such an administrative upheaval.[18] Accordingly, the Court finds that the Secretary has faithfully exercised his discretion with respect to the requirements for the assignment of wage indices as set forth in 42 U.S.C. § 1395ww(d)(2)(D).

### D. *The Equal Protection Claim*

Plaintiffs finally claim that the Puerto Rico PPS statute itself violates the Constitution. Specifically, plaintiffs argue that in enacting 42 U.S.C. § 1395ww(d)(9), Congress provided a method of determining PPS rates for Puerto Rico that is different from the method utilized nationally. This unique means of calculating payments, plaintiffs contend, results in less reimbursement to Puerto Rico hospitals as compared to the method used nationally.

Recognizing that Puerto Rico hospitals are staffed almost exclusively by people of hispanic origin, plaintiffs assert that this disparity of treatment violates their right to equal protection of the law embodied in the due process clause of the fifth amendment. *See Hampton v. Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954). Plaintiffs' equal protection claim is untenable.

Governmental action that infringes on a fundamental right or burdens a suspect class must receive strict scrutiny, and will not be upheld unless the government provides a compelling justification for the action. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The entitlement to the receipt of Medicare reimbursement is not a fundamental right guaranteed by the Constitution. *See Whitney v. Heckler,* 780 F.2d 963, 972 (11th Cir. 1986); *Adams Nursing Home v. Matthews,* 548 F.2d 1077, 1081 (1st Cir.1977). Hispanics, however, do constitute a suspect class for the purposes of equal protection analysis. *Keyes v. School District No. 1,* 413 U.S. 189, 197, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973); *Hernandez v. Texas,* 347 U.S. 475, 477–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1954).

On its face, the Puerto Rico PPS statute does not discriminate on the basis of race. The statute merely applies a distinctive methodology to Puerto Rico for the construction of PPS rates. Initially, the Court notes a striking absence of factual allegations that support plaintiffs' claim that this difference in methodology results in less payment to Puerto Rico hospitals than to hospitals nationally. However, considering this claim in a light most favorable to the plaintiffs, and assuming that the statute

---

**17.** For a description of the Secretary's use of OMB classifications, *see* 53 Fed.Reg. 38,476, 38,498 (Sept. 30, 1988).

**18.** Had plaintiffs provided a plausible reason for revamping the urban area classification into CMSAs, it is likely that any such classification would be contrary to the congressional mandate that the Secretary utilize data from large urban areas as well as from urban and rural areas. *See* OBRA, Pub.L. No. 100–203, 4002(c)(1). The basis for the determination of a "large" urban area stems exclusively from Census Bureau data, as distinct from other factors utilized by OMB for the classification of CMSAs. *Compare* 42 U.S.C. § 1395ww(d)(2)(D)(ii) *with* 45 Fed. Reg. at 959–60.

prescribed by Congress does result in a lower level of payment to Puerto Rico hospitals, plaintiffs' claim is still devoid of merit.

 It is well established that Congress, pursuant to the Territory Clause of the Constitution, Art. IV, section 3, has the power to treat Puerto Rico differently from States if there is a rational basis for doing so. *Harris v. Rosario*, 446 U.S. 651, 651–52, 100 S.Ct. 1929, 1930, 64 L.Ed.2d 587, *rehearing denied*, 448 U.S. 912, 101 S.Ct. 27, 65 L.Ed.2d 1173 (1980); *see also Garcia v. Freisecke*, 597 F.2d 284, 293 (1st Cir. 1979) *cert. denied*, 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979) (Congress "need not extend every federal program to Puerto Rico"). In ROSARIO the Supreme Court recognized three factors that provided a rational basis for Congress' decision to create a separate means of allotting assistance to Puerto Rico through the Aid to Families with Dependent Children program, which resulted in less assistance to Puerto Rico than to the States: (1) Puerto Ricans do not contribute to the federal treasury; (2) high costs of treating Puerto Rico as a state for purposes of the statute; (3) the possibility that greater benefits might disrupt the economy of Puerto Rico. *Rosario*, 446 U.S. at 652, 100 S.Ct. at 1930. These factors, as well as the unique economic circumstances attributable to Puerto Rico, support Congress' decision to prescribe a separate PPS rate for Puerto Rico.[19] Moreover, to the extent that this results in less reimbursement for Puerto Rico hospitals, it is in part due to lower operating costs on the island as compared to hospitals nationally.

The Court analysis does not end here. Although the Puerto Rico PPS statute is facially neutral, the thrust of plaintiffs' argument is that as applied it nevertheless discriminates against Hispanics because its effect is to provide Puerto Rico hospitals with a lower level of reimbursement. An allegation that facially neutral conduct violates the Equal Protection Clause, however, may not rest on a bare allegation of disparate treatment. As the Supreme Court has stated, "[d]isproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976); *see also Dayton Board of Education v. Brinkman*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (noting that actions with foreseeable adverse impact on suspect class is relevant evidence in equal protection analysis). Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Plaintiffs have not alleged this requisite intent in their amended complaint, they have not responded to this claim in their opposition to the Secretary's motion for summary judgment, and the Court is unable to glean any such intent from the statutory language or the legislative history. Accordingly, the Court finds that the Puerto Rico PPS statute is not violative of the Equal Protection Clause of the Constitution.

## IV. CONCLUSION

WHEREFORE, plaintiffs having failed to present any genuine issues of material fact to be tried, and defendant being entitled to judgment as a matter of law, defendant's motion for summary judgment is hereby granted. Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

**19.** The basic difference between the two PPS statutes is the utilization of largely Puerto Rico specific data for the Puerto Rico PPS statute combined with a small national component. The national hospitals simply adhere to a national rate.